ROSE WELLS v. MAY L. WEED AND ANOTHER.[1]

June 5, 1936.

No. 30,854.

[1]Reported in 267 N. W. 379.

*William H. Freeman,* for appellants.
*Boyles & Jacobson,* for respondent.

JULIUS J. OLSON, JUSTICE.

Plaintiff successfully maintained her action for personal injuries, having recovered a verdict for $5,000. Defendants' blended motion for judgment notwithstanding or new trial was denied, and they appeal.

About nine o'clock in the evening of June 22, 1934, plaintiff, desiring to have her trunk and other baggage removed from one residence in Northfield to another located some distance therefrom, engaged the services of defendants to transport the same. The vehicle used was a truck, defendants being engaged in the business of transporting goods for hire. It was arranged that the defendant Charles was to do the driving. He is a young man 22 years of age and an experienced driver, having been engaged in the business of transporting goods by truck from the Twin Cities to Northfield over a period of several years. Plaintiff's trunk and suitcase were placed toward the center of the truck platform, and she was instructed to "watch" the same while being carried to the new location.

The truck was of the usual type, having a cab toward the front. The carrying part of the vehicle consisted of a platform 8 feet wide by 11 feet in length. There were no stakes or boards on the sides or at the end. Plaintiff, in obedience to instructions of the driver, took her position about in the middle of the platform "holding my trunk." Charles started the truck "quite fast" and proceeded on his way. Something like a block or more from where they started he made a sudden turn to the left. The street was somewhat rough. The truck swung sharply, and plaintiff lost her balance so that she was thrown off the same, landing in the street on her feet but with

such momentum as to fall over backward, receiving thereby very severe injuries. She describes the situation thus: "I fell on my feet, and I tipped back and bumped my head." She estimates the speed at which the truck was being driven at about 35 miles per hour. She did not expect this turn, nor was she told that such turn would be made. Her expectation was that the truck would proceed in a straight line. Defendants were to carry her trunk and other baggage for a consideration. That is admitted.

The fall caused her to become immediately unconscious. She was carried from the place where she fell in the street to the edge of the boulevard and from there was taken to the Northfield City Hospital, where the professional services of Dr. Wilson were immediately obtained. The doctor testified that he found her "scalp was quite bloody," and on the "right side of the scalp above and behind the ear" was a small cut. He also found "a bruised swelling of the right ankle, discolorization of skin there." Her injuries were dressed with antiseptic dressings. She remained unconscious "for about two weeks." Some three or four days after the injury "she began to have convulsions," the first coming on about ten o'clock in the evening of June 26. The convulsions "consisted of a twitching of her eyelids and jerking of her head to the right, and following that a stiffness and jerking of muscles of the right arm or leg, and this was repeated about four times in an hour after the first one." The doctor made a puncture of the spine for the purpose of drawing "off fluid around the nervous system to help relieve any possible pressure." The result showed that the fluid "had blood in it, which is not normal. Fluid should be clear." The next morning she had another convulsion similar to the one the night before. Another puncture of the spine was made, and this fluid too was found to be bloody. This condition continued over a period of several days. "She continued to slowly improve. She gradually began to get out of the unconsciousness." This was the sixth or seventh day after the accident. Something like ten days or two weeks after the accident she began to mumble "a few words which could be understood but which were not rational. There was noth-

ing rational about her remarks." On July 10 or 11 "she began to cry a good deal and say she wanted to go home. * * * She didn't realize, of course, what she was saying." On the 19th or 20th day after the accident her condition had so far improved that she was removed to a private home. Over a period of some six or seven weeks she remained there under the care and attention of her doctor.

Her condition improved gradually in some respects. However, during the late fall of that year "she began to have dizzy spells and severe headaches." The doctor testified that on numerous occasions when he went to see her, "I had to give her hypodermic injections or opiates to relieve the pain so that she could get some rest. There is no question in my mind but what she really suffered quite a bit. Then she would be all right for two or three days, and then the same sort of thing would happen again." The doctor also discovered that she was suffering the loss of sensation. He testified:

"And on testing her out we found that she had no sensation for pinprick, light touch or from heat or cold, from her finger tips up to her shoulder on the right side. This same condition existed on the left side of her face, not the right side, but the left side, all over from the top of her head, she had absolutely no sensation whatever. * * * She used her right hand but she couldn't feel anything. This condition continued and gradually increased. The lack of sensation went down pretty nearly halfway down her back, down to the lower part of the shoulder blade on the right side, and that was up until about the first of March of this year [1935] * * * and her headaches and her dizzy spells were still continuing."

The doctor diagnosed her case as "concussion of the brain." This kind of injury is "always serious." As to the duration of plaintiff's condition the doctor said: "I admit very frankly that it is a difficult thing, hard thing to perdict, but we know there are so many people that do have lots of serious trouble subsequently, and she may yet." She was still undergoing treatment at the time of trial, more than 11 months after the accident.

Dr. Meyer of Faribault, also called as a witness for plaintiff, fully sustains the conclusions reached by Dr. Wilson. He was of opinion that "the injury was definitely on both sides of her brain, because of the location of the anesthesia. We know definitely she had an injury on the left side of her brain and which involved the motor and sensory areas of her brain and the speech center,—this is located toward the base of the brain,—because she had the paralysis she had, which is controlled by the motor area." In answer to counsel's questions: "Could you say whether or not, with any reasonable probability, she is going to have any future trouble?" the answer was, "Yes, she will."

The brain injury is, of course, the most serious of her hurts. One of the bones in her right foot was fractured, and she was still suffering some pain from this injury at the time of trial. But as to this injury the doctors seem to think that complete recovery is not far distant.

Defendants maintain that negligence on their part was not shown and that plaintiff was guilty of contributory negligence as a matter of law. However, their principal argument here is that the court erred in submitting the question of future injuries to the jury. We shall take up and discuss the questions of negligence and contributory negligence first and then the question of the court's instructions last.

■ Defendants owed plaintiff the duty of due care. There can be no question, so it seems to us, that defendants' conduct presented a jury issue. The driver knew plaintiff's position on the truck platform. Rounding a corner sharply and at the rate of speed here appearing cannot be said to be as a matter of law exercising due care toward plaintiff, who was without means of supporting or guarding herself. Obviously her position was one of insecurity if the driver of the truck was not careful. The swaying of a vehicle of this size, especially when passing over rough surfaces, might naturally lead to just such result as here obtained. Defendants' claim that "35 miles per hour is not an unreasonable rate of speed and certainly is nothing out of the ordinary" does not appeal to us as an accurate statement of defendants' duty. The general rule ap-

plicable to the situation here presented is aptly stated in 4 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934), § 6974, as follows:

"Whenever a person is placed in such a position with regard to another that it is obvious that if he does not use due care in his own conduct he will cause injury to that person, the duty at once arises to exercise care commensurate with the situation in which he thus finds himself to avoid such injury." See also cases cited under notes.

■ And as to plaintiff's contributory negligence, we think that question, too, was for the jury. Without further discussion we hold that the court properly submitted to the jury the questions of defendants' negligence and plaintiff's contributory negligence.

■ With respect to damages the court said amongst other things:

"You cannot award damages to her for future and permanent injuries unless you are satisfied that she has in fact sustained permanent and future injuries, unless you are satisfied of that to a reasonable certainty."

Obviously this instruction is not subject to criticism. Defendants, however, maintain that the evidence does not warrant the submission of any such issue. It seems to us that the record clearly indicates some degree of future pain and suffering and consequent damages. The verdict was for $5,000. Plaintiff had incurred doctors', hospital, and medical expenses amounting to nearly $500 (to be exact $459.45). This sum does not include anything for loss of time or wages. Even if we were to grant, which we do not, that the evidence does not justify any compensation beyond that suffered by plaintiff up to and including the time of trial, we think the verdict is sustainable and should be sustained. She is a young woman, 25 years of age. At the time of trial, more than 11 months after the injury, she was still suffering severe pains. She was still incapacitated. Dr. Wilson called upon her twice weekly. She was under his care. The brain injury had not yet cleared. Dr. Meyer testified when he took an X-ray picture of her head some time before the trial:

"I found two small opacities in the X-ray pictures toward the— about one inch in back of the center of the head." He claims that "there is some disturbance in the brain; in the center of equilibrium." And further: "In testing for anesthesia I found the following: There was complete anesthesia to pain, deep muscular pain, light touch and cold over the entire right arm and back to the sixth thoracic vertebra; over the back of the shoulder blades, to the front of the clavicle, the left side; there was a small area of anesthesia over the left shoulder; anesthesia from below the left jaw to the mid-line on the left side of the face; there was a one-inch scar on the right side of the scalp." And, further, that in his opinion she had suffered "a concussion of the skull, not a fractured skull, with contrecoup injury to the opposite side of the head. * * * The injury was definitely on both sides of her brain, because of the location of the anesthesia. We know definitely she had an injury on the left side of her brain and which involved the motor and sensory areas of her brain and the speech center."

In Hillstrom v. Mannheimer Bros. 146 Minn. 202, 206, 178 N. W. 881, this court sustained a recovery of $12,000. The principal injury consisted of a fracture of the skull. Plaintiff was in the hospital about a month and was then taken to his home. The action was brought the day before he left the hospital and was tried some six months later. At the time of trial the skull had entirely healed but plaintiff was still weak. He had not regained his normal weight and had weak heart action and low blood pressure, indicating the prostration of his vital powers. His examining physicians testified that he was not then in condition to go to work and that "it was difficult to say when he could work again, although they agreed that in all probability his injuries are not of a permanent nature."

In this case plaintiff did not suffer a skull fracture but she did suffer a brain injury, and, after all, such injury is necessarily more to be feared than a mere fracture of the skull itself.

No medical testimony was adduced in defendants' behalf. They submitted the case without any medical testimony. So it is safe to

assume that what plaintiff's doctors testified to is well founded in fact.

Order affirmed.